NOT DESIGNATED FOR PUBLICATION

No. 114,469

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOSEPH H. PAGE, *et al.*,
*Appellants*,

v.

CECIL "DON" HAUN, *et al.*,
*Appellees*.

MEMORANDUM OPINION

Appeal from Crawford District Court; LORI A. BOLTON FLEMING, judge. Opinion filed August 26, 2016. Affirmed.

*Daniel F. Church* and *Marshall W. Woody*, of Morrow Willnauer Klosterman Church, LLC, of Kansas City, Missouri, for appellants.

*Diane H. Sorensen* and *Will B. Wohlford*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellees.

Before GREEN, P.J., MCANANY and ATCHESON, JJ.

*Per Curiam*:  Joseph Page (Joe) and Francis Page and Carol Knisley and Shirley Knisley (Shirley) sued Cecil "Don" Haun (Don), Carole Haun, and Brad Haun (Brad) for damages arising from their relationship as coowners and members of Big Drive Cattle, L.L.C. (BDC). The trial court granted summary judgment in favor of the Hauns, ruling that the Pages and Knisleys were either barred from bringing their claims under the statute of limitations or for lack of standing.

1

The Pages and Knisleys appeal this ruling, arguing that the trial court erred in three ways. First, the Pages and Knisleys argue that they raised contract claims, in addition to tort claims, within their original petition; thus, the trial court erred by finding that they raised only tort claims. Second, the Pages and Knisleys challenge the trial court's summary judgment ruling, asserting: (1) that their tort claims were not barred by the statute of limitations; and (2) that they had standing to bring their remaining claims. Third, the Pages and Knisleys argue that even if the trial court's other rulings were correct, the trial court erred by denying their motion to amend their petition.

On the other hand, the Hauns assert that the Pages and Knisleys only raised tort claims that were either untimely or not properly before the court for lack of standing. Moreover, the Hauns contend that justice did not require that the trial court grant the Pages and Knisleys' motion to amend their petition. Finding no reversible error, we affirm.

In March 2009, the Pages, Knisleys, and Hauns formed BDC in Nebraska under the Nebraska Limited Liability Company Act, repealed January 1, 2013. Originally, there were other members of BDC, but the Pages, Knisleys, and Hauns bought these members out in January 2010. After buying the other members out, the Pages, Knisleys, and Hauns executed a second operating agreement.

Under BDC's operating agreement, BDC was a member-managed LLC. The operating agreement required that all members "elect an Operating Manager of the Company who shall be in charge of the day to day activities." The operating manager had sole and exclusive control to conduct BDC business and could act on behalf of BDC in accordance with the operating agreement. Nevertheless, the members could vote to remove the operating manager with or without cause. The operating manager was also in charge of maintaining and keeping accurate books, which all members could inspect and audit from time to time. The operating agreement contained a provision stating that the

2

operating agreement was "a complete statement of all of the arrangements among the parties with respect to the Company."

From the start, the members elected Don to serve as BDC's operating manager. Moreover, Brad was appointed as secretary, and Carole Haun, although not a formal officer, assisted with maintaining BDC's books. Although BDC was formed and operated in Nebraska, the Pages, Knisleys, and Hauns all resided in Kansas.

When BDC began conducting business in March 2009, BDC leased a feedlot in Cedar Rapids, Nebraska. One year later, in March 2010, BDC obtained a loan from Farm Credit Services of America, PCA (Farm Credit) and purchased the feedlot located in Cedar Rapids. While BDC was operating the feedlot, the Pages and Knisleys would send their own cattle to BDC to be fattened and sold for slaughter. Additionally, in January 2011, the Pages purchased 200,000 bushels of corn from BDC that was stored at the BDC feedlot.

A.J. Ostrander served as BDC's on-site manager from the time BDC leased the feedlot in February 2009 until he was fired on February 14, 2011. The Hauns, together with Carol Knisley, fired A.J. because A.J. continued to buy cattle when he was told not to do so. After a short time, it became evident that A.J. had embezzled somewhere between $1,500,000 and $3,000,000 from BDC. When Farm Credit learned of the embezzlement, it demanded full payment of its loan, but BDC did not have the necessary funds to repay the loan.

As a result, in September 2011, BDC voluntarily filed for bankruptcy in the United States Bankruptcy Court of the District of Nebraska. During the bankruptcy proceedings, the Pages filed a creditor claim against BDC for $2,315,000 because "[c]attle on Debtor's premises that were lost, sold, or moved off premises without owners['] consent and/or payment, and corn on Debtor's premises involved in fire loss, or

3

utilized by Debtor without consent or payment." According to the bankruptcy schedules, BDC had $3,967,394.71 in assets and $3,358,361 in liabilities. BDC owed Farm Credit $2,570,943.58, and BDC owed Joe $60,017.50. The schedules further showed that Joe's claim was an unsecured nonpriority claim.

The Pages, Knisleys, and Hauns also hired a certified public accountant (CPA) firm to go through BDC records to determine how many cattle were missing at the BDC feedlot. According to an email between BDC's attorney, Larry Markle, and the Hauns, Shirley, and the Pages' attorney, Daniel Church, the CPA firm's first forensic accounting report was issued in November 2011. This first report, however, was not included in the record on appeal.

While the bankruptcy proceedings were pending, Farm Credit sued the Pages, Knisleys, and Hauns to collect on its loan in the United States District Court of Nebraska. On February 1, 2012, the Pages, Knisleys, and Hauns filed counterclaims against Farm Credit for negligence, negligent misrepresentation, and breach of its duties of good faith and fair dealing for failing to promptly withdraw A.J.'s line of credit or oversee A.J.'s cattle counts at the BDC feedlot. By this time, the Pages had fallen out with the Hauns, so the Pages separately filed their counterclaims against Farm Credit even though the Pages' counterclaims and the Knisleys and Hauns' counterclaims were essentially identical.

Later in February 2012, the Pages, Knisleys, and Hauns decided to sell the feedlot and BDC's assets by auction to pay off its debt to Farm Credit. Paul and John Groetke first entered a bid to buy BDC for $3,075,000. Later, the Groetkes entered a bid to buy BDC for $3,825,000. Because the Groetkes entered the highest bid, the Pages, Knisleys, and Hauns voted to sell BDC to the Groetkes. In May 2012, the bankruptcy court approved the sale of BDC to the Groetkes for $3,825,000.

In June 2012, the CPA firm issued the second forensic accounting report. This report detailed cattle movements at BDC from its formation through March 2011. The

report showed "a negative variance of 3,953 head of cattle," *i.e.*, BDC's intake to output ratio of cattle was off by 3,953 cattle.

In August 2012, all of the Pages' claims as well as all of the Knisleys and Hauns' claims against Farm Credit were dismissed for failure to state a claim upon which relief could be granted. See *Farm Credit Services of America, PCA v. Haun*, No. 8:11CV320, 2012 WL 3201894, at *6 (D. Neb. 2012) (unpublished opinion). This decision was ultimately affirmed by the Eighth Circuit Court of Appeals in *Farm Credit Services of America, FLCA v. Haun*, 734 F.3d 800 (8th Cir. 2013). Although not detailed in the record on appeal, in September 2012, Farm Credit's claims were dismissed because BDC's debts were paid in full. See *Farm Credit Services of America, PCA v. Haun*, No. 8:11CV320, 2012 WL 3991468 (D. Neb. 2012) (unpublished opinion).

In February 2013, the Pages filed suit against Farm Credit in the United States District Court of Kansas for negligent misrepresentation, fraudulent misrepresentation, negligence, and breach of good faith and fair dealing. The Pages alleged that Farm Credit had committed these torts by failing to keep track of their cattle located at the BDC feedlot. The Pages argued that Farm Credit had a duty to oversee their cattle at BDC because Farm Credit financed two of their personal loans for purchases at the BDC feedlot. The United States District Court of Kansas ultimately granted summary judgment in favor of Farm Credit on all of the Pages' claims. See *Page v. Farm Credit Services of America*, PCA, No. 13-2073-RDR, 2014 WL 3853436, at *7 (D. Kan. August 6, 2014) (unpublished opinion), *appeal dismissed* (10th Cir. November 12, 2014).

On April 1, 2014, the Pages and Knisleys filed suit against the Hauns in the Crawford County trial court. In their petition, the Pages and Knisleys alleged that the Hauns were aware of some of BDC's financial problems in March 2010. The Pages and Knisleys alleged that the Hauns were aware that A.J. was making business decisions that were inconsistent with members' interests and other cattle owners' interests around

5

August 2010. The Pages and Knisleys further alleged that the Hauns knew that A.J. was using BDC money for his own personal use by August 2010. The Pages and Knisleys explained that although the Hauns were aware of these problems before A.J.'s firing, the Hauns never shared this information about A.J.'s improper behavior with them.

The Pages and Knisleys asserted that because the Hauns failed to tell them about this mismanagement, they took the following detrimental actions: (1) the Pages invested an additional $125,000 into BDC; (2) the Pages bought 200,000 bushels of corn for $1,060,000 from BDC; and (3) the Pages and Knisleys continued to send their cattle to BDC. Additionally, the Pages and Knisleys alleged the following: (1) that Don allowed Farm Credit to wrongfully retain sale proceeds of their cattle without prior approval; (2) that Brad bought and sold cattle with A.J. under the name CTA while using BDC funds without members' approval; and (3) that the Hauns acted deceptively when selling BDC because they were both the buyer and the seller, helping finance the Groetkes' purchase of BDC without their prior approval.

Based on the preceding allegations, the Pages and Knisleys brought six causes of actions against the Hauns—breach of fiduciary duty, negligent supervision, fraud, conversion, negligence, and negligent misrepresentation.

In count one, the Pages and Knisleys argued that Don breached his fiduciary duties to them as the managing member of BDC in the following way: (a) "fail[ing] to manage and supervise BDC in the operation of its feedlot"; (b) "fail[ing] to manage and supervise the financial affairs of BDC"; (c) "fail[ing] to inform BDC members, including Plaintiffs, of known improprieties occurring at the feedlot and involving the feedlot's manager, [A.J.]."; (d) "fail[ing] to properly manage the financial affairs of BDC as it relate[d] to its loan with Farm Credit"; and (e) "fail[ing] to disclose to Plaintiffs, Defendant's interest in purchasing BDC's feedlot while simultaneously selling BDC's feedlot." The Pages and Knisleys also argued that Brad breached his fiduciary duty to them as a coowner by

6

buying and selling cattle with A.J. under the name CTA. The Pages and Knisleys asserted that these breaches damaged both them and BDC in excess of $75,000.

In count two, the Pages and Knisleys asserted that Don "had a duty to exercise reasonable care in controlling and supervising employee [A.J.] and other employees at the feedlot." The Pages and Knisleys asserted that Don's negligent supervision over A.J. and other BDC employees resulted in lost cattle profits, lost BDC assets, and lost value in their BDC ownership interests in excess of $75,000.

In count three, the Pages and Knisleys contended that Don, as the managing member of BDC, defrauded them by failing to tell them about BDC's financial problems. The Pages and Knisleys asserted that Don's fraud resulted in lost cattle profits, lost BDC assets, and lost value in their BDC ownership interests in excess of $75,000.

In count four, the Pages and Knisleys maintained that the Hauns converted the following: (a) a Ford F-250 owned by BDC; (b) corn that was designated to feed the Pages' cattle alone; (c) many head of cattle; and (d) other BDC assets used to improve BDC after its sale "but before Defendants took possession." Regarding the corn, the Pages asserted that the Hauns used the corn "contrary to the terms of the bailment" by feeding the corn to cattle they did not own, by not remitting the sale proceeds from this unauthorized use of corn, and by allowing their corn to be destroyed in a fire. Regarding the cattle, the Pages and Knisleys contended that "[c]ontrary to the agreement between Plaintiffs and Defendants, and contrary to the instructions of Plaintiffs, Defendants or Defendants' agents converted Plaintiffs' cattle in that Defendants sold or allowed the sale of these cattle but allowed the funds to be misappropriated by Farm Credit."

In count five, the Pages and Knisleys repeated that Don, as the managing member, owed a duty to them "to exercise ordinary care in safeguarding Plaintiff's property." Specifically, the Pages and Knisleys complained that Don did not exercise ordinary care

7

in safeguarding their cattle and corn. The Pages and Knisleys asserted that Don's negligent actions with their cattle and corn resulted in losses in excess of $75,000.

In count six, the Pages and Knisleys argued that they would not have continued to send their cattle to BDC or continued to invest in BDC but for Don's negligent misrepresentations about BDC's financial state. The Pages further asserted that they would not have bought the 200,000 bushels of corn but for Don's negligent misrepresentations. The Pages and Knisleys stated that Don's negligent misrepresentations resulted in lost cattle profits, lost corn profits, lost BDC assets, and lost value in their BDC ownership interests in excess of $75,000.

The Hauns answered by asserting that they were not liable to the Pages and Knisleys for any of the alleged damages. Moreover, the Hauns moved for summary judgment under K.S.A. 2015 Supp. 60-256. In their motion for summary judgment, the Hauns first argued that all of the Pages and Knisleys' claims were based in tort, meaning the 2-year statute of limitations under K.S.A. 60-513(a)(4) was applicable. In other words, the Pages and Knisleys' claims were time-barred if their claims were reasonably ascertainable 2 years before they filed their April 1, 2014, petition.

The Hauns asserted that the uncontroverted facts supported that the Pages and Knisleys' claims were time-barred. The Hauns explained that given the prior court cases and the extensive discovery regarding the Pages and Knisleys' claims were reasonably ascertainable before April 1, 2012. To support their arguments, the Hauns attached the following: (1) BDC's operating agreement; (2) BDC's motion for a temporary restraining order (TRO) against A.J. and the TRO; (3) BDC's voluntary bankruptcy petition; (4) BDC's first creditor meeting transcript; (5) Joe's creditor claim against BDC; (6) Joe's document entitled "cattle movements 3-14-2011"; (7) Joe's affidavit from the bankruptcy case, deposition from the Farm Credit case, and declaration for the Farm Credit case; (8) BDC member and attorney emails concerning the first forensic accounting report and the

8

second forensic accounting report; (9) the Pages' answer and counterclaim against Farm Credit; (10) the Knisleys and Hauns' answer and counterclaim against Farm Credit; and (11) Carol Knisley's motion to the bankruptcy court to approve bidding procedures. The Hauns honed in on the following facts: (1) that the Pages and Knisleys always knew that the Hauns held a management position for the operation of BDC; (2) that the Pages and Knisleys knew that BDC was having financial difficulties, in part because of A.J.'s embezzlement, before April 1, 2012; (3) that the Pages and Knisleys knew about cattle losses before April 1, 2012; and (4) that the Pages knew that a fire had destroyed some of their corn before April 1, 2012.

The Pages and Knisleys responded that the trial court should not grant the Hauns' motion for summary judgment for two reasons. First, the Pages and Knisleys asserted that they raised both tort and contract claims within their petition. The Pages and Knisleys contended that because they referenced the fact BDC was an LLC and that Don was the managing member of BDC, they had sufficiently alleged that the Hauns violated the BDC operating agreement. Moreover, the Pages and Knisleys contended that because they had pled that BDC violated certain agreements concerning their cattle and corn, they had sufficiently pled breaches of bailment agreements.

Second, the Pages and Knisleys argued that the trial court should deny the Hauns' motion for summary judgment because they brought their tort claims within 2 years of their injuries becoming reasonably ascertainable. The Pages and Knisleys contended that their claims were reasonably ascertainably only after: (1) they had received the second forensic accounting report in June 2012, and (2) they had learned about Don's February 2014 deposition testimony where he testified that he was not involved in the day-to-day operation of BDC and suspected that A.J. was stealing before he was fired in February 2011. The Pages and Knisleys alleged that these documents were the first evidence indicating the Hauns' "complicity" in A.J.'s acts. Finally, the Pages and Knisleys argued

that at the very least, summary judgment was inappropriate because material facts were in dispute.

The Hauns replied that the Pages and Knisleys' arguments were meritless for three reasons. First, the Hauns noted that the Pages and Knisleys never even mentioned the operating agreement let alone alleged a breach of the operating agreement within their petition. Second, the Hauns argued that the Pages and Knisleys never pled that the Hauns breached bailment agreements, noting that even if they had, they were not the proper party as the bailment contracts were with BDC. Third, the Hauns argued that the final forensic accounting report and Don's testimony at the February 2014 deposition were irrelevant as other uncontroverted facts proved that the Pages and Knisleys knew about their potential claims before April 1, 2012.

The trial court held a hearing on the Hauns' motion for summary judgment. At that hearing, the parties repeated their previous arguments. The parties also agreed that because there was a Nebraska choice of law provision within the BDC operating agreement, Nebraska substantive law applied. The trial court then took the matter under advisement.

The trial court granted partial summary judgment in favor of the Hauns. First, the trial court analyzed all six of the Pages and Knisleys' causes of actions and found that "there [were] simply no facts whatsoever related to the BDC Operating Agreement, or a breach of *any* agreement between the parties alleged in the Petition." Accordingly, the trial court found that "Plaintiffs only brought claims based in tort." Moreover, the trial court suggested that the Pages and Knisleys were purposely twisting the language in their petition to avoid the 2-year tort statute of limitations, stating: "Plaintiffs cannot now frame these claims as contract claims to avoid a statute of limitations defense."

Then, the trial court cited the evidence from previous discovery showing that the Pages and Knisleys knew about A.J.'s embezzlement, lost cattle, and lost corn before April 1, 2012. The trial court concluded that at the very latest, because both the Pages and Knisleys had filed counterclaims against Farm Credit by February 1, 2012, the Pages and Knisleys knew or should have known about the following claims by this date: (1) Don's alleged breaches of fiduciary duties concerning his failures in managing and supervising BDC's feedlot, his failures in managing BDC's financial affairs, his failures in communicating BDC's financial problems with BDC's other members, and his failures in managing BDC's financial affairs related to Farm Credit as detailed in count one; (2) Don's alleged negligence regarding the supervision A.J. and other BDC employees detailed in count two; (3) Don's alleged fraudulent actions detailed in count three; (4) Hauns' alleged conversion of the Pages' corn that was lost in a fire detailed in count four; (5) Don's alleged negligent acts detailed in count five; and (6) Don's alleged negligent misrepresentations detailed in count six. Thus, the trial court granted summary judgment on all of those claims because they were time-barred.

The trial court, however, determined that summary judgment was inappropriate for the following claims: (1) The Pages and Knisleys' claim that the Hauns breached their fiduciary duties by acting as both buyer and seller of BDC; (2) the Pages and Knisleys' claim that Brad breached his fiduciary duties by selling cattle with A.J. under the name CTA; (3) the Pages and Knisleys' claim that the Hauns converted BDC's truck, other BDC assets, and their cattle; and (4) the Pages' claim that the Hauns converted their corn not consumed by fire. The trial court explained that it could not grant summary judgment on those claims because the Hauns never alleged when those claims became reasonably ascertainable.

Following the order for partial summary judgment, the Pages and Knisleys moved to amend their petition to include contract claims. The Pages and Knisleys alleged that allowing their amendments would not prejudice the Hauns because "the allegations in the

11

First Amended Petition [were] virtually the same as the original. The only changes include[d] the addition of the breach of Operating Agreement, breach of fiduciary duties sounding in contract, arising from the Operating Agreement, and conversion."

The Hauns responded that the trial court should deny the Pages and Knisleys' motion because the new count one, labeled "breach of operating agreement," simply repeated their time-barred claims. Moreover, the Hauns explained how the Pages and Knisleys' remaining amended counts, "breach of fiduciary duty" and "conversion," simply repeated the claims that the trial court had determined were not time-barred. Citing several Kansas cases, including *Kinell v. N.W. Dible Co.*, 240 Kan. 439, 444, 731 P.2d 245 (1987), and *Moody Investments, Inc. v. Baldwin*, 12 Kan. App. 2d 686, 694, 754 P.2d 810 (1988), the Hauns further argued that parties cannot amend their petition following a summary judgment order.

In addition to their response, the Hauns filed a second motion for summary judgment. In this motion, the Hauns argued that the trial court should grant summary judgment because (1) the Pages and Knisleys lacked standing to bring their claims that the Hauns had breached their fiduciary duties by acting as both buyer and seller in the sale of BDC, that Brad breached his fiduciary duty by selling cattle under the name CTA with A.J., and that the Hauns converted the feedlot truck and BDC assets in making repairs to BDC and because (2) the Pages' remaining claims concerning conversion of cattle and corn were time-barred under the 2-year statute of limitations. Regarding standing, the Hauns argued that BDC, not the Pages and Knisleys, suffered any injuries that may have resulted from the Hauns' breaches or conversions; thus, BDC, not the Pages and Knisleys, had standing to bring those claims. To support this motion, the Hauns again attached several documents, including Joe's creditor claim against BDC and the Pages' complaint against Farm Credit in the United States District Court of Kansas with its attachment entitled "Joe Page Corn Consumption and Loss (1/20/11-6/24/11)."

12

The Pages and Knisleys responded to the Hauns' second motion for summary judgment, arguing that they were entitled to a liberal interpretation of their pleadings under Kansas' notice pleading standards and that the Hauns never produced any facts concerning the Knisleys' injuries or claims. The Pages and Knisleys attached the BDC's bankruptcy trustee's complaint against Carole Knisley as proof that the Knisleys had cattle at BDC and were therefore injured separately from the Pages.

The trial court held a hearing on the Hauns' motion and the Pages and Knisleys' motion, and the parties essentially repeated the arguments within their motions and responses.

The trial court denied the Pages and Knisleys' motion to amend and granted the Hauns' motion for summary judgment. Citing *Freedom Fin. Group v. Woolley*, 280 Neb. 825, 792 N.W.2d 134 (2010), and *Meyerson v. Coopers & Lybrand*, 233 Neb. 758, 762, 448 N.W.2d 129 (1989), the trial court ruled that the Pages and Knisleys lacked standing to bring their breach of fiduciary duty claim against the Hauns regarding being both seller and buyer of BDC, their breach of fiduciary duty claim against Brad regarding CTA, their conversion claim concerning the truck, and their conversion claim concerning the alleged improvements the Hauns made to BDC with BDC assets. The trial court reached this ruling because for each of those claims, the Pages and Hauns explicitly alleged that the Hauns improperly used BDC's funds or property, meaning BDC had suffered any injury that may have occurred. Last, the trial court ruled that the Pages and Knisleys' remaining conversion claims were barred under the 2-year tort statute of limitations because (1) at the very latest, the Pages knew the full extent of their cattle losses when they filed their creditor claim against BDC in December 2011 and, because (2) at the very latest, the Pages knew about their corn losses when they filed their creditor claim against BDC in December 2011.

*Were the Pages and Knisleys' Causes of Action Based in Contract or Tort?*

Before addressing the parties' arguments, we note that BDC's operating agreement specifically states: "Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of Nebraska." Both parties agree that based on this choice of law provision, Nebraska substantive law applies. Moreover, "'[w]here the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally effectuate the law chosen by the parties to control the agreement.'" *Fleetwood Enterprises v. Coleman Co.*, 37 Kan. App. 2d 850, 861, 161 P.3d 765 (2007) (quoting *Brenner v. Oppenheimer & Co.,* 273 Kan. 525, 539, 44 P.3d 364 [2002]). Nevertheless, "matters of procedure are usually considered to be subject to the law of the forum." *Western Video Collectors. v. Mercantile Bank*, 23 Kan. App. 2d 703, 705, 935 P.2d 237 (1997). In this case, we must apply the substantive law of Nebraska law but the procedural law of Kansas.

In addition, although the parties assert that BDC was organized under the Nebraska Uniform Limited Liability Company Act (NULLCA), Neb. Rev. Stat. § 21-101 *et seq*., BDC was actually organized under the Nebraska Limited Liability Company Act, see Neb. Rev. Stat. § 21-2601 *et seq.*, repealed January 1, 2013. This does not have a practical effect in this case. Neb. Rev. Stat. § 21-197(b) states that "after January 1, 2013, [NULLCA] governs all limited liability companies" regardless of when that limited liability company was formed. See also Maser & Hefflinger, *Nebraska's New Limited Liability Company Act: A Welcome Improvement for Legal Guidance Concerning Limited Liability Companies*, 89 Neb. L. Rev. 470, 472 (2011) (discussing how this provision gives exiting LLCs under the old act a 2-year grace period before they become subject to NULLCA). Thus, NULLCA applies even though BDC was not organized under the Act.

Turning to the issue in question, we must now consider whether the Pages and Knisleys brought causes of action in contract. On appeal, the Pages and Knisleys assert that the trial court erred in ruling that they pled only tort claims. Primarily, the Pages and Knisleys argue that they sufficiently pled multiple contract causes of action within their petition under Kansas' lenient notice pleading standard. The Pages and Knisleys argue that their contract claims for breaches of the BDC operating agreement and breaches of their respective cattle and corn bailment agreements are subsumed within their tort claims. The Hauns, however, contend that the Pages and Knisleys only pled causes of actions in tort.

Whether the Pages and Knisleys pled contract claims in addition to tort claims is important to the survival of their action. As the Pages and Knisleys point out, they have a 5-year time limit to bring a breach of contract claim under K.S.A. 60-511 and a 3-year time limit to bring a breach of bailment agreement claim under K.S.A. 60-512. Thus, even if their tort claims were barred by the 2-year statute of limitations under K.S.A. 60-513(a)(4), the Pages and Knisleys contend that their alleged causes of action for breach of the BDC operating agreement and for breach of bailment agreements were timely.

*Applicable Law*

"Under Kansas' notice pleading, the petition is not intended to govern the entire course of the case." *Rector v. Tatham*, 287 Kan. 230, 232, 196 P.3d 364 (2008). K.S.A. 2015 Supp. 60-208(a)(1) merely requires that a plaintiff make "a short and plain statement of the claim showing that the pleader is entitled to relief."  All the same, "[n]otice pleading [does] not do away with the traditional causes of action or the need to at least present the 'bare bones' of the cause of action in the petition *in a concise and understandable manner*." (Emphasis added.) *Meyer Land & Cattle Co. v. Lincoln County Conservation Dist.*, 29 Kan. App. 2d 746, 756, 31 P.3d 970 (2001). Thus, Kansas' lenient

15

notice pleading standard does not protect plaintiffs from summary judgment when they have altogether failed to plead a specific claim.

To determine whether plaintiffs brought an action in tort or in contract, an appellate court must look at "the nature of the duty sought to be enforced." *Dill v. Barnett Funeral Home, Inc.*, No. 90,653, 2004 WL 292124, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 278 Kan. 844 (2004); see *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 374, 552 P.2d 885 (1976). "A breach of a duty arising from the specific terms of a negotiated agreement supports an action under the terms of the agreement, or an action in contract. Contrarily, where the performance of the duty has been imposed by law, an action for a breach is properly brought in tort." *Dill*, 2004 WL292124, at *6 (citing *KPERS v. Reimer & Koger Assocs., Inc.,* 262 Kan. 110, 114, 936 P.2d 714 [1997]).

Obviously, many times a plaintiff may be able to argue both tort and contract violations. Still, plaintiffs cannot frame a tort claim as a contract claim, or vice versa, in an attempt to avoid the applicable statute of limitations. See *10th Street Medical v. State*, 42 Kan. App. 2d 249, 257, 210 P.3d 670 (2009); *Robinson v. Shah*, 23 Kan. App. 2d 812, 936 P.2d 784 (1997). As explained by this court in *Dill*, this is because contract and tort actions are inherently different: "Under contract theory, a party is entitled to the economic benefit for which he or she negotiated and provided legal consideration. [Citation omitted.] Under tort theory, a person is entitled to monetary compensation for some personal injury recognized by law. [Citation omitted.]." 2004 WL 292124, at *6. In sum, "[i]f the '*gravamen of the action is a breach of the legal duty and not of the contract itself, the action is in tort.*'" *Hunt v. KMG Main Hurdman*, 17 Kan. App. 2d 418, 421, 839 P.2d 45 (1992) (quoting *Chavez, Executrix v. Saums*, 1 Kan. App. 2d 564, 566, 571 P.2d 62, *rev. denied* 225 Kan. 843 [1977]).

16

*The Pages and Knisleys Did Not Plead Breach of Operating Agreement*

The Pages and Knisleys first argue that subsumed within their breach of fiduciary duty and fraud causes of action, they alleged that the Hauns violated the BDC operating agreement. In their brief, the Pages and Knisleys spend time explaining how they sufficiently pled breaches of the operating agreement within count two—negligent supervision, but they are actually citing language from count one—breach of fiduciary duty—and count three—fraud. The Pages and Knisleys point out that the following language was included within those counts: (1) "[Don] was the managing member of BDC and placed in a position of confidence"; (2) Don "[a]s the managing member of BDC, [] owed a fiduciary duty to act in the best interest of BDC and Plaintiffs as members"; (3) "[Don] breached his fiduciary duties to Plaintiffs as members of BDC" in various ways by failing to adequately manage BDC; (4) Don breached his fiduciary duty in both selling and purchasing BDC; (5) Brad as a coowner owed a fiduciary duty to other co-owners of BDC not to "self-deal or abscond with assets of BDC" by selling cattle under the name CTA while using BDC funds; (6) "[Don], in his position as managing member of BDC, had knowledge of discrepancies and misdeeds of employees of BDC pertaining to the financial condition of BDC, to Plaintiffs' property held at BDC, and Plaintiffs' interest in BDC"; (7) "[Don], as managing member of BDC had specific knowledge of the manager and staffs' misconduct and misappropriation of funds and assets of Plaintiffs, yet, intentionally failed to communicate to the Plaintiffs these material facts known to him"; and (8) "Plaintiffs justifiably relied upon Defendant Don to communicate to Plaintiffs these material facts affecting Plaintiffs' property and interests in BDC." Nevertheless, there is a significant problem with this argument.

It is readily apparent that the Pages and Knisleys never pled a breach of the operating agreement. All of the Pages and Knisleys' evidence supporting that they sufficiently pled a breach of the operating agreement can be broken down into two categories: (1) that they referenced that Don was the managing member of BDC multiple

17

times within their petition; and (2) that they referenced that Brad was a co-owner of BDC one time within their petition. In sum, the Pages and Knisleys ask this court to find that they sufficiently pled that the Hauns breached the operating agreement because they mentioned Don's and Brad's official positions as members of BDC.

Nonetheless, as the trial court explained in its finding, the Pages and Knisleys never asserted that the Hauns violated the BDC operating agreement or even mentioned that an operating agreement existed. Also, the Pages and Knisleys never cited to the BDC operating agreement as proof that they were entitled to damages arising from duties the Hauns were obligated to do but failed to perform. Instead, the Pages and Knisleys alleged that they were entitled to compensation because the Hauns violated certain duties imposed on them by law. Undoubtedly, given the total lack of reference to the operating agreement, the Pages and Knisleys have failed to plead violations of the operating agreement in a concise and understandable manner as required under Kansas' bare-bones pleading standard. See *Meyer Land & Cattle Co.*, 29 Kan. App. 2d at 756.

In their attempt to undermine the trial court's findings, the Pages and Knisleys circumvent these facts, emphasizing that "'where doubt exists as to whether the action is based on tort or on quasi or implied contract, words appropriate to an action for tort will be disregarded and the petition will be interpreted as counting in contract.'" *Continental Ins. Co. v. Windle*, 214 Kan. 468, 471, 520 P.2d 1235 (1974) (quoting *Crabb v. Swindler, Administratrix*, 184 Kan. 507, 337 P.2d 986 [1959]). They also point out that under Nebraska law, statutes in existence when a contract was executed become a part of the contract. See *Travelers Indem. Co. v. International Nutrition, Inc.*, 273 Neb. 943, 953, 734 N.W.2d 719 (2007). Neither of these rules, however, help the Pages and Knisleys' causes of action.

Clearly, if a plaintiff totally fails to allege a breach of contract, then a court has no duty to ignore the tort language and find contract claims. Not to mention, this case does

18

not involve a quasi or implied contract, making this rule inapplicable. Furthermore, although Nebraska law might interpret contracts as incorporating statutes in existence when the contract was executed, this does not mean that the Pages and Knisleys sufficiently pled a breach of the BDC operating agreement. This simply means that had the Pages and Knisleys sufficiently pled a breach of the BDC operating agreement, they would have been able to point to provisions not necessarily included in the BDC operating agreement but detailed in a statute to support that the Hauns had violated some duty owed to them.

Finally, the Pages and Knisleys argue that the trial court's first memorandum decision and order proves that they sufficiently pled a breach of the BDC operating agreement. The Pages and Knisleys assert that they sufficiently pled a breach of the BDC operating agreement because the trial court "made findings of fact which included provisions included in the Operating Agreement that is the subject in the Plaintiff[s'] breach of contract claims in this case." In essence, the Pages and Knisleys argue that because the trial court knew there was an operating agreement, they must have sufficiently pled a breach of the operating agreement. Nevertheless, this is the logical fallacy of affirming the consequent, which can be characterized in the following syllogism: (1) If a plaintiff pleads a cause of action related to the breach of an operating agreement, then the trial court will know the operating agreement exists; (2) The trial court knew the operating agreement existed; and (3) Therefore, the Pages and Knisleys sufficiently pled a breach of the operating agreement. Because there are a variety of ways that the trial court could have learned about the operating agreement outside of plaintiffs sufficiently pleading a breach of the operating agreement, this conclusion is flawed. For example, the trial court could have learned about the operating agreement in an exhibit or a deposition.

To conclude, it is readily apparent that the Pages and Knisleys never pled that the Hauns breached the operating agreement. Furthermore, their arguments to the contrary

are fatally flawed. Given the Pages and Knisleys' failure to even mention the existence of the operating agreement in their petition, we determine that the Pages and Knisleys failed to meet Kansas' lenient bare-bones notice pleading standard.

*The Pages and Knisleys Did Not Plead a Breach of Cattle and Corn Bailment Agreements*

Next, the Pages and Knisleys argue that they sufficiently pled a breach of oral cattle and corn bailment agreements with BDC. Again, although the Pages and Knisleys refer to themselves generally as "Plaintiffs," based on their pleadings, only the Pages had corn stored at BDC.

The Pages and Knisleys assert that the following statements within count four of their petition put the Hauns on notice that they were suing them for breach of bailment agreements: (1) "Plaintiffs [Pages] purchased corn from BDC feedlot, and BDC was to hold the corn in its custody and control while Plaintiffs [Pages] retained ownership of the corn"; (2) "[t]he corn was designated specifically for use in feeding Plaintiffs' [Pages'] cattle"; (3) "BDC, by and through its managing member [Don], converted the corn of Plaintiffs [Pages]" by "[u]s[ing] the corn contrary to the terms of the bailment, i.e. used the corn for feeding cattle other than Plaintiffs' [Pages'] cattle," "[a]llow[ing] corn to be destroyed in a fire at the BDC feedlot due to improper storage," and "[a]ppropriat[ing] the corn for BDC's own use, specifically for feeding BDC cattle without paying the Pages for the corn"; (4) "Defendants converted the corn which was intentional and unauthorized and Defendant Don . . . knew that BDC did not have ownership of the corn, and knew that the corn was for consumption by Plaintiffs' [Pages'] cattle or to be sold"; and (5) "[c]ontrary to the agreement between Plaintiffs and Defendants, and contrary to the instructions of Plaintiffs, Defendants or Defendants' agents converted Plaintiffs cattle in that Defendants sold or allowed cattle owned by Plaintiffs to be sold to third parties and

did send payment to Plaintiffs for the sale of these cattle but allowed the funds to be misappropriated by Farm Credit."

The Pages and Knisleys assert that the following statements within count five of their petition put the Hauns on notice that they were suing them for breach of bailment agreements: (1) "Plaintiffs delivered cattle to BDC, and BDC accepted receipt of the cattle, sold Plaintiffs' cattle and failed to pay Plaintiffs the sale proceeds"; (2) "[w]hile Plaintiffs' property was in the custody and control of BDC, said property was lost, stolen, destroyed or sold without proceeds paid over to Plaintiffs"; (3) BDC owed a duty to "Plaintiffs to exercise ordinary care in safeguarding Plaintiffs' property while it was in BDC's control and to insure payments were made to Plaintiffs for the sale of their cattle and corn"; (4) "Defendants were [] negligent" by "fail[ing] to properly remit proceeds from the sale of the cattle to Plaintiffs"; and (5) "Plaintiffs were damaged by Defendant [Don's] breach of the duty of care, losing thousands of cattle, corn and failing to pay over funds from the sale of cattle to Plaintiffs."

Here, the Pages and Knisleys pled that they had an agreement with BDC to feed, fatten, and sell their cattle. The Pages and Knisleys pled that BDC was then supposed to remit their cattle sale proceeds. The Pages and Knisleys further pled that BDC failed to care for their cattle and sell their cattle in accordance with the terms of their agreements. Regarding the corn, the Pages pled that they bought 200,000 bushels of corn, which was stored at BDC. The Pages pled that they had a bailment agreement with BDC regarding the storage and use of the corn, but BDC violated this agreement.

Nevertheless, the fact the Pages and Knisleys asserted that they had agreements concerning cattle and corn with BDC and that BDC violated those agreements does not necessarily mean that the Pages and Knisleys sufficiently pled breaches of those bailment agreements.

21

In *Hunt*, this court addressed whether minority shareholder's action against bank auditors for "failing to discover and point out in the audit report the bank's improper valuation of certain speculative investments" was based in tort or contract. 17 Kan. App. 2d at 419. The minority shareholder argued that his action was based in contract because in the bank auditor's engagement letter, the bank auditor promised to create a report detailing any weaknesses or recommendations. Yet, the *Hunt* court noted that Kansas' courts have "held that where there is both a contractual relationship and a relationship that gives rise to a legal duty such as the attorney-client relationship, the breach of that legal duty gives rise to a tort action." 17 Kan. App. 2d at 421; see *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 716 P.2d 575 (1986); *Brueck v. Krings*, 230 Kan. 466, 638 P.2d 904 (1982); *Chavez*, 1 Kan. App. 2d at 566.

In essence, "[i]f the '*gravamen of the action is a breach of the legal duty and not of the contract itself, the action is in tort*.'" *Hunt*, 17 Kan. App. at 421 (quoting *Chavez*, 1 Kan. App. 2d at 566. In reaching its holding, the *Hunt* court noted that "elements of contract and tort [were] present." 17 Kan. App. 2d at 424. Because the engagement letter did not specifically require the auditor to discover improper valuations and speculative investments, however, the *Hunt* court ruled that "the gravamen of the action by [the minority shareholder was] based on the failure of the auditors to perform duties imposed upon them by law." 17 Kan. App. 2d at 424.

The Pages and Knisleys' case is similar to *Hunt*. As members of BDC, the Hauns had a legal duty to the Pages and Knisleys. Moreover, because the Pages and Knisleys evidently had bailment agreements with BDC, a separate contractual duty existed as well. Regardless, the gravamen of the Pages and Knisleys' causes of action is a breach of a legal duty and not a breach of bailment agreements.

Although the Pages and Knisleys asserted that they had bailment agreements and BDC violated those agreements, those assertions were subsumed within their arguments

22

that the Hauns committed conversion and negligence. More importantly, a close review of their allegations proves that they were seeking damages for a breach of a legal duty. For instance, all of the allegations concerning the bailment agreements within count four involved how the Hauns damaged the Pages and Knisleys by converting their property. All of the allegations concerning the bailment agreements within count five involved how the Hauns' negligence damaged the Pages and Knisleys, emphasizing that the Hauns owed them a duty of care. Moreover, although the Pages and Knisleys mentioned that they believed their cattle profit losses were in excess of $700,000, the Pages and Knisleys never explicitly stated that they were seeking damages for the breached bailment agreements. Instead, they asserted that they were entitled to damages because of the Hauns' conversion and negligence. Thus, the Pages and Knisleys' causes of action were based in tort alone.

Additionally, this conclusion is supported by their attorney Church's very telling statement before the trial court. While arguing that the Pages and Knisleys should be allowed to amend their petition, the trial court told Church that it believed they conveniently came up with the contract claims only after they realized their tort claims were barred by the statute of limitations. In response, Church stated:

> "*We pled it in tort because we believed that that was the best advantage for us to proceed*, the Court being [*sic*] that it was gone under the statute of limitations. We have five years to plead this cause of action in Kansas; five years.

> "We could dismiss this and re-file it. I mean, that's why—that's why the courts freely grant leave to file amended petitions. It's not so—Kansas rules aren't so that the plaintiffs can be thrown out of court. Usually, it's to allow the parties to plead necessary cause of action so that they can maintain their claims in court." (Emphasis added.)

Although Church's statement is somewhat jumbled, he very clearly admitted to the trial court that they originally brought the Pages and Knisleys' actions in tort because they

23

"believed that was the best advantage for [them] to proceed." Then, only after the trial court ruled that their tort claims were "gone under the statute of limitations" did they attempt to argue breach of contract. Obviously, this evidence does not support that the Pages and Knisleys sufficiently pled breaches of bailment agreements within their petition.

*Conclusion*

The Pages and Knisleys pled causes of action in tort, not contract. Neither the Pages and Knisleys' arguments that they pled a breach of the BDC operating agreement nor the Pages and Knisleys' argument that they pled breaches of their cattle and corn bailment agreements are convincing. As a result, the trial court properly determined that their causes of actions were based solely in tort.

*Did the Trial Court Err When It Granted Summary Judgment in Favor of the Hauns?*

Next, the Pages and Knisleys argue that the trial court erred by granting the Hauns' motions for summary judgment for two reasons. First, the Pages and Knisleys argue that the trial court erred by granting the Hauns' motions for summary judgment because neither their tort claims nor their contract claims were barred under the statute of limitations. Second, the Pages and Knisleys argue that the trial court erred by granting the Hauns' motions for summary judgment because they had standing to bring their remaining breach of fiduciary duty claims and conversion claims.

Because the Pages and Knisleys' arguments can be more easily dealt with by taking their arguments out of the order, we will first address whether the Pages and Knisleys have standing and then address whether the Pages and Knisleys brought any claims within the 2-year time limit of K.S.A. 60-513(a)(4).

*Applicable Law*

Under K.S.A. 2015 Supp. 60-256(a), "[a] party against whom relief is sought may move, with or without supporting affidavits or supporting declarations pursuant to K.S.A. 53-601, and amendments thereto, for summary judgment on all or part of the claim."

When reviewing whether the trial court erred in granting summary judgment, an appellate court exercises de novo review. *Hansford v. Silver Lake Heights,* 294 Kan. 707, 710, 280 P.3d 756 (2012). In explaining when summary judgment is appropriate, our Supreme Court has stated:

> "Summary judgment is appropriate when the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Mitchell v. City of Wichita*, 270 Kan. 56, Syl. ¶ 1, 12 P.3d 402 (2000).

In essence, when a defendant moves for summary judgment, summary judgment is appropriate only when both the facts and the law establish that the plaintiff is not entitled to relief.

Fact issues constitute genuine issues of material fact only if the fact affects a controlling issue. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). Thus, a court is not precluded from granting summary

25

judgment when factual disputes unrelated to controlling issues exist. *Northern Natural Gas Co.*, 296 Kan. at 935.

Generally, summary judgment is appropriate only after discovery is complete. *Med James, Inc. v. Barnes*, 31 Kan. App. 2d 89, 96, 61 P.3d 86 (2003). Yet, "if the facts pertinent to the material issues are not controverted, summary judgment may be appropriate even when discovery is unfinished." *Med James, Inc.*, 31 Kan. App. 2d at 96. Moreover, parties "cannot avoid summary judgment on the mere hope that something may develop later during discovery or at trial." *Kincaid v. Dess*, 48 Kan. App. 2d 640, 656, 298 P.3d 358 (2013).

*The Pages and Knisleys Lacked Standing to Bring Many of Their Claims*

On appeal, the Pages and Knisleys argue that the trial court erred when it determined that they lacked standing to bring the following claims: (1) their breach of fiduciary duty claim against Brad regarding buying and selling cattle with A.J. under the name CTA; (2) their breach of fiduciary duty claim against the Hauns regarding their actions of being both seller and buyer during the BDC bankruptcy sale; (3) their conversion claim regarding the truck; and (4) their conversion claim regarding the unauthorized use of BDC funds to make improvements following the bankruptcy sale. The Pages and Knisleys argue that the trial court misconstrued Nebraska law by applying *Freedom Fin. Group v. Woolley*, 280 Neb. 825, 792 N.W.2d 134 (2010), and *Meyerson v. Coopers & Lybrand*, 233 Neb. 758, 448 N.W.2d 129 (1989), two Nebraska cases concerning shareholders' standing to bring direct actions, to their case involving LLC members' standing to bring a direct action. On the other hand, the Hauns contend that the Pages' and Knisleys' arguments are meritless because the trial court correctly applied Neb. Rev. Stat. § 21-164 and Nebraska caselaw in reaching its determination.

26

"Standing is a jurisdictional question whereby courts determine 'whether the plaintiff has alleged such a personal stake in the outcome of a controversy as to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on his or her behalf.'" *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750-51, 189 P.3d 494 (2008) (quoting *Moorhouse v. City of Wichita,* 259 Kan. 570, 574, 913 P.2d 172 [1996]). Thus, if a party lacks standing to bring a claim, then a court lacks jurisdiction to make any decisions regarding that claim. "Because standing implicates the court's jurisdiction to hear a case, the existence of standing is a question of law over which this court's scope of review is unlimited." *Board of Sumner County Comm'rs*, 286 Kan. at 751. Furthermore, because standing implicates a court's jurisdiction to hear a case, this court has the duty to question its jurisdiction on its own initiative when the record on appeal reveals a lack jurisdiction. See *Hajda v. University of Kansas Hosp. Auth.*, 51 Kan. App. 2d 761, 774, 356 P.3d 1 (2015), *rev. denied* 303 Kan. ___ (February 18, 2016).

Here, the Hauns raised the issue of standing in their second motion for summary judgment after the trial court had already granted summary judgment on most of the Pages and Knisleys' claims. As a result, in their second motion for summary judgment, the Hauns never addressed whether the Pages and Knisleys had standing to bring the claims that the trial court already deemed time-barred. That being so, the trial court limited its rulings regarding standing to the arguments raised by the Hauns, and the parties on appeal have limited their arguments regarding standing to the trial court's rulings made below.

Nevertheless, there are significant questions as to whether the Pages and Knisleys have standing to bring many of their claims, not just the claims the trial court determined they lacked standing to bring. Thus, we will consider whether the Pages and Knisleys have standing to bring each of their claims.

27

*Neb. Rev. Stat. § 21-164(a)*

Under Neb. Rev. Stat. § 21-164(a), "a member may maintain a direct action against another member, a manager, or the limited liability company to enforce the member's rights and otherwise protect the member's interests, including rights and interests under the operating agreement or the Nebraska Uniform Limited Liability Company Act or arising independently of the membership relationship." Yet, subsection (b) of Neb. Rev. Stat. § 21-164 further explains that "[a] member maintaining a direct action under this section *must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company*." (Emphasis added.) Accordingly, Neb. Rev. Stat. § 21-164(b) limits who has standing to bring a direct action under the act based on what injuries the member has pled.

In determining whether a member of an LLC may bring a direct action, Nebraska courts have treated such cases identical to cases brought by a shareholder of a corporation. See *Freedom Fin. Group*, 280 Neb. at 832-33; *Klingelhoefer v. Parker, Grossart*, 20 Neb. App. 825, 832, 834 N.W.2d 249 (2013). Generally, "a shareholder may not bring an action in his or her own name to recover for wrongs done to the corporation or its property. Such a cause of action is in the corporation and not the shareholders." *Klingelhoefer*, 20 Neb. App. at 832; see *Meyerson*, 233 Neb. at 762. This is because, as a rule, shareholders may sue solely as representatives of the corporation given that their right to sue is derivative in nature. *Klingelhoefer*, 20 Neb. App. at 832. The only time shareholders can bring actions as individuals occurs when those shareholders establish an individual harm. *Klingelhoefer*, 20 Neb. App. at 832. "In order to establish an individual harm, the shareholder must allege a separate and distinct injury or a special duty owed by the party to the individual shareholder. [Citation omitted.] A 'special duty' is a duty owed to the shareholder separate and distinct from the duty owed to the entity. [Citation omitted.]" *Klingelhoefer*, 20 Neb. App. at 832; see *Meyerson*, 233 Neb. at 762.

28

Although both *Freedom Fin. Group* and *Klingelhoefer* involved individual LLC members suing for attorney malpractice, these cases still support that under Nebraska law, cases involving individual members of LLCs maintaining direct actions would be subject to the same rules as individual shareholders of corporations maintaining direct actions. First, the separate and distinct requirement for shareholder's direct actions mimics the language in Neb. Rev. Stat. § 21-164(b) that states that members may bring a direct action under the statute only if they "plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." Second, it seems no other Nebraska cases state anything to the contrary, and the Pages and Knisleys have not cited any such case. Third, Nebraska's NULLCA is largely identical to the Revised Uniform Limited Liability Company Act (ULLCA) (2006). See also Maser & Hefflinger, *Nebraska's New Limited Liability Company Act*, 89 Neb. L. Rev. 470 (2011) (discussing Nebraska's adoption of the ULLCA). The comments to ULLCA § 801, which is identical to Neb. Rev. Stat. § 21-164, state that the standing rule detailed in subsection (b) "codifies the rule of standing that predominates in entity law." That is, this rule was adopted to conform to other entity law, like corporate law, to ensure that LLC members cannot bring direct actions unless they can also prove a distinct individual harm.

Turning to the Pages and Knisleys' arguments, we note that they principally argued that the trial court incorrectly relied on the *Freedom Fin. Group* and *Meyerson* decisions in determining that they lacked standing because those cases involved shareholders of corporations suing third parties. Nevertheless, based on our earlier discussion, this argument is clearly incorrect. The trial court relied on *Freedom Fin. Group* and *Meyerson* for the proposition that the Pages and Knisleys had standing to bring their claims only if they could prove (1) that the injuries they suffered were separate and distinct from injuries BDC suffered or (2) that the Hauns owed them a special duty. As discussed in *Freedom Fin. Group* and *Klinghoffer*, in Nebraska, rules concerning whether a shareholder has standing to bring a direct action apply when

29

determining whether a member of an LLC has standing to bring a direct action.  Of note, the *Klinghoffer* court reached this conclusion by relying on the *Freedom Fin. Group* court, and the *Freedom Fin. Group* court reached this conclusion by relying on *Meyerson*. See *Freedom Fin. Group*, 280 Neb. at 832-34; *Klingelhoefer*, 20 Neb. App. at 831-32. Moreover, the purpose of the standing provision is to imitate the standing provisions in other entity law, like corporate law. See Direct Action by Member, ULLCA § 801, 6B U.L.A. at 177, § 801 & comment b (2016 Supp.). To sum up, the trial court properly relied on the *Freedom Fin. Group* and *Meyerson* decisions in determining if the Pages and Knisleys lacked standing in this matter.

*The Pages and Knisleys Lack Standing to Bring All of Their Claims Involving Injuries to BDC*

Within the Pages and Knisleys' petition, their claims are easily separated into two categories: claims involving injuries to BDC and claims involving injuries stemming from cattle and corn losses.  Generally, the Pages and Knisleys allege both injuries to BDC and injuries stemming from cattle and corn losses within the same count. Turning our focus solely to those claims involving injuries to BDC, we note that the Pages and Knisleys lacked standing to bring those claims.

To summarize, within the Pages and Knisleys' petition, the Pages and Knisleys made the following allegations about why they should receive damages for injuries to BDC: (1) in count one—breach of fiduciary duty—the Pages and Knisleys alleged that they were entitled to damages because the Hauns' various breaches benefited the Hauns "to the detriment of BDC" by misusing BDC funds and BDC assets ; (2) in count two—negligent supervision—the Pages and Knisleys alleged that they were entitled to damages because Don's failure to supervise BDC employees resulted in lost value in their ownership interests in BDC and other assets at BDC; (3) in count three—fraud—the Pages and Knisleys alleged that they were entitled to damages because Don fraudulently

30

hid BDC's financial problems resulting in lost value in their BDC investments and "lost property of BDC"; (4) in count four—conversion—the Pages and Knisleys alleged that they were entitled to damages because the Hauns converted a truck owned by BDC and assets belonging to BDC; (5) in count six—negligent misrepresentation—the Pages and Knisleys alleged that they were entitled to damages because the Hauns negligently misrepresented BDC's finances resulting in lost BDC assets and lost value in their BDC investments.

This list of the Pages' alleged injuries and the Knisleys' alleged injuries shows that they lacked standing to bring those claims under Neb. Rev. Stat. § 21-164(b). First, the Pages and Knisleys failed to "plead and prove an actual or threatened injury that [was] not solely the result of an injury suffered or threatened to be suffered by [BDC]" as required to establish standing under Neb. Stat. Rev. § 21-164(b). In fact, this would be an impossibility because each injury the Pages and Knisley pled was derivative of an injury suffered by BDC. That is, if the Pages and Knisleys suffered any lost value in their BDC ownership interest, BDC assets, or other BDC property, they suffered these injuries because the Hauns' actions harmed BDC, which in turn, injured them as members of BDC. Furthermore, the Pages and Knisleys never alleged that the Hauns owed them a special duty that would allow them to bring a direct action. So, in regard to those specific claims, the Pages and Knisleys cannot bring a direct action under Neb. Rev. Stat. § 21-164(b). Instead, to properly bring their claims, the Pages and Knisleys would need to bring a derivative action under Neb. Rev. Stat. § 21-165.

To sum up, the Pages and Hauns lack standing to bring many claims, not just the claims that the trial court ruled on below. In total, the Pages and Knisleys lack standing to bring all of their claims listed in counts one, two, three, four, and six to the extent those claims involved injuries to BDC. This includes the trial court's original rulings that the Pages and Knisleys lacked standing to bring their breach of fiduciary duty claim against the Hauns for acting as both buyer and seller of BDC, their breach of fiduciary duty claim

31

against Brad for selling cattle with A.J. under the name CTA while using BDC assets, and their conversion claim concerning the truck and improper use of other BDC assets. As a result, because the Pages and Knisleys lacked standing to bring those claims, we lack jurisdiction over any arguments concerning those claims. See *Board of Sumner County Comm'rs*, 286 Kan. at 751.

Turning focus to the claims involving injuries stemming from cattle and corn losses, we note that the Pages and Knisleys alleged the following: (1) in count one—breach of fiduciary duty—the Pages and Knisleys alleged that Don's failures in managing BDC resulted in them not properly receiving their cattle sale proceeds and continuing to send cattle to BDC even though Don suspected A.J. was stealing; (2) in count two—negligent supervision—the Pages and Knisleys alleged that Don's failure to supervise BDC employees resulted in lost cattle; (3) in count three—fraud—the Pages and Knisleys alleged that Don fraudulently hid BDC's financial problems resulting in lost cattle; (4) in count four—conversion—the Pages and Knisleys alleged that the Hauns converted their cattle and corn; (5) in count five—negligence—the Pages and Knisleys alleged that the Hauns were negligent with their cattle and corn, failing to remit their cattle and corn profits; and (6) in count six—negligent misrepresentation—the Pages and Knisleys alleged that the Hauns negligently misrepresented BDC's finances resulting in lost cattle and corn. Moreover, within their petition, the Pages and Knisleys alleged that the Pages personally owned cattle sent to the BDC feedlot, that the Knisleys personally owned cattle sent to the BDC feedlot, and that the Pages owned the 200,000 bushels of corn stored at the BDC feedlot.

*K.S.A. 60-513(a)(4)*

Because interpretation and application of a statute of limitations involves a question of law, appellate courts have unlimited review over the trial court's determination. *Med James, Inc.*, 31 Kan. App. 2d at 98. Whether a plaintiff's claims are

barred by the statute of limitations is an affirmative defense. K.S.A. 2015 Supp. 60-208(c)(1)(P). Thus, the defendant bears the burden of pleading and proving that a plaintiff's claims are barred by the statute of limitations. *Slayden v. Sixta*, 250 Kan. 23, 26, 825 P.2d 119 (1992).

In Kansas, a plaintiff's tort claims are subject to a 2-year statute of limitations. K.S.A. 60-513(a)(4). In *Michaelis v. Farrell*, 48 Kan. App. 2d 624, 630-31, 296 P.3d 439 (2013), this court explained:

> "The statute of limitations starts to run in a tort action when the act first causes 'substantial injury.' [Citation omitted.] Kansas courts have interpreted the phrase 'substantial injury' to mean 'actionable injury.' [Citation omitted.] 'The rule which has developed is: The statute of limitations starts to run in a tort action at the time a negligent act causes injury if both the act and the resulting injury are reasonably ascertainable by the injured person.' [Citation omitted.]"

The phrase "substantial injury" requires that a person must have "a 'sufficient [reasonably] ascertainable injury to justify an action for recovery of damages.'" *Michaelis*, 48 Kan. App. 2d at 631. This means that the 2-year tort statute of limitations begins to run when a person has "knowledge of the fact of injury, not the extent of injury." *Med James, Inc.*, 31 Kan. App. 2d at 99.

The phrase reasonably ascertainable "'suggests an objective standard based upon an examination of the surrounding circumstances.'" *Michaelis*, 48 Kan. App. 2d at 631 (quoting *P.W.P. v. L.S.*, 266 Kan. 417, 425, 969 P.2d 896 [1998]). Once a plaintiff has reason to suspect a tort and information confirming that a tort has been committed exists, the statute of limitations begins to run because the tort is reasonably ascertainable. *Michaelis*, 48 Kan. App. 2d at 631. The running of the statute of limitations is postponed only "'until the time the plaintiff is able to determine that [his or her] injury may be caused by some act of the defendant.'" *Michaelis*, 48 Kan. App. 2d at 631 (quoting *Benne*

33

*v. International Business Machines Corp*., 87 F.3d 419, 427 [10th Cir. 1996]). Nevertheless, plaintiffs have a duty to investigate; plaintiffs cannot toll the statute of limitations simply because they ignored tort-implicating information that was ascertainable. See *Michaelis*, 48 Kan. App. 2d at 631.

"If examining the surrounding circumstances shows that the plaintiff clearly has knowledge of his or her injury and that the defendant was the likely cause, the trial court can make the legal determination that the injury was reasonably ascertainable at that point." *Michaelis*, 48 Kan. App. 2d at 631. The trial court should not make such a determination, however, if material facts are in dispute. *Michaelis*, 48 Kan. App. 2d at 631.

*Uncontroverted Timeline*

The trial court ultimately granted summary judgment in favor of the Hauns because it found that both their injuries and the Hauns alleged acts causing those injuries were reasonably ascertainable before April 1, 2012. Regarding the Pages, the trial court found: (1) that the Pages' injuries stemming from corn losses were reasonably ascertainable by either April 30, 2011, when their corn was destroyed by fire, but no later than December 30, 2011, when they filed a creditor claim against BDC for corn losses; (2) that the Pages' injuries stemming from cattle losses were reasonably ascertainable no later than February 1, 2012, the date the Pages filed their separate counterclaim against Farm Credit; and (3) that the fact that some act of the Hauns may have caused those injuries was also reasonably ascertainable by February 1, 2012. Regarding the Knisleys, the trial court found: (1) that the Knisleys' injuries stemming from cattle losses were reasonably ascertainable no later than February 1, 2012, the date they filed their counterclaim against Farm Credit; and (2) that the fact that some act of the Hauns may have caused those injuries was reasonably ascertainable by February 14, 2011, the date Carol Knisley participated in A.J.'s firing.

The Pages and Knisleys assert that their tort claims were not reasonably ascertainable until: (1) they received the second forensic accounting report in June 2012; and (2) they received Don's February 2014 deposition. The Pages contend that until they received the second forensic accounting report, they could not have known the full extent of their losses. The Pages and Knisleys point out that Larry and Bob Ginn, another BDC attorney, stated that BDC was unable to know the full extent of their losses until after receiving the second forensic accounting report, and even then, the document did not show who caused their cattle and corn losses. They also contend that until they received Don's February 2014 deposition, in which Don testified that he was not actively involved in everyday management of BDC and that he suspected that A.J. was embezzling money starting in mid-2010, they could not have known that the Hauns caused their injuries.

Nevertheless, the results of the second forensic accounting report and Don's testimony at his February 2014 deposition are irrelevant if other uncontroverted facts showed that the Pages and Knisleys' claims were reasonably ascertainable before April 1, 2012. A review of the uncontroverted facts presented to the trial court is necessary. The following is a list of uncontroverted facts, established by the pleadings, the previous discovery attached to the Hauns' motions for summary judgment, as well as the prior discovery attached to the Pages and Knisleys' responses to those motions:

- August or October 2010—According to Joe's deposition testimony, this is when he realized that he was short 5,000 head of cattle.
- November 2010—According to the second forensic accounting report, this is the last time the Knisleys had cattle at the BDC feedlot. This is also confirmed by BDC's trustee's complaint, which the Pages and Knisleys attached to their response to the Hauns' second motion for summary judgment. The United States District Court of Nebraska found that Carol Knisley's last cattle sale at BDC occurred in November 2010. See *In re Big Drive Cattle, L.L.C.*, No. 4:15CV3039,

35

2016 WL 1270987, at *3 (D. Neb. 2016), *appeal filed* May 5, 2016, in the Eight Circuit Court of Appeals.

- January 20, 2011—According to Joe's deposition testimony and motions against Farm Credit, this is when he purchased 200,000 bushels of corn.

- February 14, 2011—According to both the Hauns' first motion for summary judgment and the Pages and Knisleys' response to this motion, this is the date Don, Brad, and Carol Knisley went to the BDC feedlot and fired A.J.

- February 15, 2011—The date BDC filed a TRO order against A.J. to prevent him from further diverting BDC money from BDC accounts. Don filed an affidavit with his motion stating that all members suspected that A.J. had been embezzling from BDC. The trial court granted BDC's motion for TRO the following day.

- March 16, 2011—According to Joe's declaration against Farm Credit, this is the date he knew 1,252 head of his cattle were lost, missing, or unaccounted for. Attached to this motion, the Pages included a document entitled "Cattle Movements for 3-14-2011," in which Joe had written "fraud" and "inaccurate head counts" several times in the margins.

- April 30, 2011—A fire destroyed some of the Pages' bushels of corn. According to Joe's deposition testimony, he learned about the fire "right after A.J. got fired."

- June 24, 2011—According to the Pages' complaint against Farm Credit in the United States District Court of Kansas, this was the last day they had cattle at the BDC feedlot. The Pages also admit this was the last day they had cattle at the BDC feedlot in their appellate brief. According to a document entitled "Joe Page Corn Consumption and Loss (1/20/11-6/24/11)," which the Pages attached to the complaint against Farm Credit, this is also the date the Pages had 84,080.19 bushels of corn remaining at the BDC feedlot.

- September 9, 2011—The date BDC voluntarily filed for bankruptcy.

- October 13, 2011—The date the first meeting of creditors in bankruptcy court took place. At this meeting, Don testified: (1) that A.J. was fired for embezzling; (2)

36

that he had been the member manager of BDC since the LLC was first organized; (3) that he visited BDC's feedlot in Cedar Rapids only 8 to 12 times; (4) that while A.J. was employed with BDC, he did not realize that A.J. had opened a checking account in BDC's name, that A.J. had stolen corn by requesting that farmers send refund checks to him personally, that A.J. had stolen other rancher's cattle by taking the cattle's tags off and then selling them to another feedlot; (5) that all members, not just him, were responsible for overseeing A.J.; and (6) that he found out that A.J. had opened a bank account in his name, in which he diverted BDC money, in late 2010.

- November 21, 2011—The date Larry emailed the Hauns, Shirley, and the Pages' attorney, Daniel, information concerning the first forensic accounting report that the CPA firm created detailing BDC's finances. In this email, Larry stated: "A quick review of this file shows that A.J. had things totally screwed! Each member should carefully review the transactions designated under your name. That way you can compare your records with what the Accountants found. The 2nd Report should be coming soon."

- December 30, 2011—The date that the Pages filed a proof of claim in the bankruptcy court requesting $2,315,000 from BDC because "[c]attle on Debtor's premises that were lost, sold or moved off premises without owners['] consent and/or payment, and corn on Debtor's premises involved in fire loss, or utilized by Debtor without consent and payment."

- January 5, 2012—The date Larry sent another email to the Hauns, Shirley, and Daniel regarding the forensic accounting report. In this email, Larry stated: "[The report] will not specifically show that any member committed wrong-doing. Rather, my understanding is that the report will show inconsistencies in the records and irregular and illogical record keeping. Since A.J. was in charge of record keeping, one should be able to attribute the seemingly bogus record keeping to him and suggest fraud on his part."

37

- February 1, 2012—The date the Knisleys and the Hauns filed an answer and counterclaim in the Farm Credit case. The Knisleys and the Hauns sued Farm Credit for negligence, negligent misrepresentation, and breach of their duty of good faith and fair dealing, in part, because Farm Credit failed to remove A.J. from BDC's line of credit promptly or properly oversee A.J's cattle counts. The Knisleys further alleged that Farm Credit was negligent in keeping accurate cattle counts.

- February 1, 2012—The date the Pages filed a separate answer and counterclaim against Farm Credit, suing Farm Credit for negligence, negligent misrepresentation, and breach of their duty of good faith and fair dealing, in part, because Farm Credit failed to remove A.J. from BDC's line of credit promptly, failed to properly oversee A.J.'s cattle counts, and failed to keep accurate cattle counts.

*The Pages' Injuries and Knisleys' Injuries Were Reasonably Ascertainable Before April 1, 2012*

The injuries at issue in the Pages and Knisleys' surviving claims can be broken down into three categories: (1) The Pages' injuries stemming from corn losses; (2) the Pages' injuries stemming from cattle losses; and (3) the Knisleys' injuries stemming from cattle losses.

*The Pages' Injuries Stemming From Corn Losses*

Within their petition, the Pages allege that they suffered corn losses when corn was burned in a fire at BDC and when corn was used in an unauthorized way without payment. The trial court ruled that the injuries stemming from corn lost in the fire were reasonably ascertainable by April 2011. The trial court ruled that injuries stemming from corn losses unrelated to the fire were reasonably ascertainable by December 2011.

38

The uncontroverted facts prove that the trial court was correct. According to Joe's own deposition testimony, he learned about the fire that destroyed the corn "right after A.J. got fired." According to the Pages' own petition, the fire occurred on April 30, 2011. Accordingly, this injury was reasonably ascertainable by April 30, 2011.

Regarding the corn not lost in the fire, according to the Pages' December 2011 creditor claim against BDC, they knew that corn at the BDC feedlot was "utilized by Debtor without consent and payment" at this time. In their brief, the Pages try to circumvent this fact by asserting that since the corn was presumably still on BDC's feedlot when it was sold in May 2012, they could not know the extent of their damages until sometime after that date. Yet, this argument ignores that the statute of limitations begins to run when a plaintiff has knowledge of the fact of injury caused by the defendant, not knowledge of the entire extent of the injury caused by the defendant. See *Med James, Inc.*, 31 Kan. App. 2d at 99. Clearly, by December 2011, the Pages had knowledge that while their corn was on the BDC feedlot, some of it was used in a manner not prescribed by their agreement. As a result, the Pages' corn injuries unrelated to the fire loss were reasonably ascertainable by December 2011.

*The Pages' Injuries Stemming From Cattle Losses*

The Pages assert that they suffered two types of cattle related injuries: injuries related to cattle disappearing from the BDC feedlot and injuries related to not receiving payment for cattle sales. The trial court ruled that all of the Pages' cattle related injuries were reasonably ascertainable no later than February 1, 2012, when the Pages filed their separate counterclaim against Farm Credit.

The uncontroverted facts prove that the trial court was correct. According to Joe's deposition testimony, he realized he was short 5,000 head of cattle in August or October 2010, and he recognized that his cattle counts were not adding up before A.J. was fired.

39

In a motion against Farm Credit, the Pages admitted that they knew 1,252 head of cattle were lost, missing, or unaccounted for following Joe's March 16, 2011, visit to the BDC feedlot. The Pages admit that the last day they had cattle at the BDC feedlot was June 24, 2011. The Pages' December 2011 creditor claim against BDC stated that "[c]attle on Debtor's premises were lost, sold, or moved off premises without owners consent . . . ." Moreover, in the Pages' February 1, 2012, counterclaim against Farm Credit, they asserted that Farm Credit failed to oversee A.J. and A.J.'s cattle counts. Thus, the trial court correctly found that the Pages knew that some of their cattle were missing no later than February 1, 2012.

As to the missing cattle proceeds, given that the Pages' last cattle were sold from the BDC feedlot in June 2011, they should have realized they were not properly paid for the cattle sales shortly thereafter. Certainly, they should have realized this well before April 1, 2012. Given their December 2011 counterclaim, it is clear that the Pages had actual knowledge of the lack of payment before April 1, 2012, as they alleged that "[c]attle on Debtor's premises were lost, sold, or moved off premises without owners consent and/or payment." Moreover, as the trial court ruled, the fact that the Pages were able to file a counterclaim against Farm Credit for cattle losses on February 1, 2012, proves that the Pages had time to investigate what had happened to their missing cattle sale proceeds. Therefore, the trial court correctly ruled that the Pages should have recognized all their injuries stemming from cattle losses by February 1, 2012, at the latest.

*The Knisleys' Injuries Stemming From Cattle Losses*

The Knisleys, like the Pages, asserted that they suffered two types of cattle-related injuries: injuries related to cattle disappearing from the BDC feedlot and injuries related to not receiving payment for cattle sales. The trial court ruled that all of the Knisleys'

cattle-related injuries were reasonably ascertainable no later than February 1, 2012, when the Knisleys filed their counterclaim against Farm Credit.

The uncontroverted facts showed that the trial court was correct. As to the missing cattle, Carol Knisley participated in A.J.'s firing in February 2011, Shirley received the emails from Larry about A.J. having "things totally screwed" in December 2011, and the Knisleys filed a counterclaim against Farm Credit for not overseeing A.J. or his cattle counts in February 2012. As a result, the Knisleys' injuries were reasonably ascertainable no later than February 1, 2012, because they had actual knowledge of their missing cattle by that date. As to the missing cattle sale proceeds, the last date the Knisleys had cattle at the BDC feedlot was in November 2010. That being the case, they should have recognized that they had not been properly paid for their cattle sales shortly afterwards. Moreover, given the fact that the Knisleys filed a counterclaim against Farm Credit on February 1, 2012, they had already had enough time to investigate their cattle-related losses. Thus, all of the Knisleys cattle-related injuries were reasonably ascertainable no later than February 1, 2012.

*Even if Some Act of the Hauns Caused Injuries to the Pages and the Knisleys, These Injuries Were Reasonably Ascertainable Before April 1, 2012*

Having established that the Pages' injuries and the Knisleys' injuries were reasonably ascertainable before April 1, 2012, this court must next consider whether the fact that some act of the Hauns caused their injuries was reasonably ascertainable before April 1, 2012.

The Pages and Knisleys' claims regarding Don's breaches of fiduciary duties, negligent supervision, negligence, and negligent misrepresentation would have become reasonably ascertainable at the same time. That is, each of those claims involve Don acting negligently and failing to exercise ordinary care while serving as the member

41

manager of BDC, resulting in mismanagement of BDC's finances and BDC's employees. As to those counts, the trial court found that the Knisleys could have reasonably ascertained that Don caused their injuries by February 14, 2011, the date Carol Knisley participated in A.J.'s firing. Because Carol Knisley participated in A.J.'s firing and A.J. was fired for not following Don's orders about buying cattle, the Knisleys should have suspected that Don was having problems managing BDC's finances and BDC's employees by that date. This certainly would have triggered the Knisleys' duty to investigate. See *Michaelis*, 48 Kan. App. 2d at 631.

Moreover, although the trial court relied solely on the fact Carol Knisley participated in A.J.'s firing, the Knisleys certainly knew that Don could have caused their injuries by failing to properly manage BDC's finances and employees before April 1, 2012, because (1) they knew BDC had filed for bankruptcy in September 2011; (2) they had access to Don's testimony from the October 2011 first meeting of the creditors where he testified (a) A.J. was fired for embezzling, which he was mostly unaware of, (b) he visited the BDC feedlots only 8 to 12 times, and (c) all members were jointly responsible for monitoring A.J.; (3) they received the November 2011 and January 2011 emails from Larry stating that A.J. had "things totally screwed"; and (4) they filed a counterclaim against Farm Credit, in which they recognized there were both financial and employee problems at BDC. All things considered, even if their claims were not reasonably ascertainable by February 14, 2011, the Knisleys could have reasonably ascertained that Don's acts, which constituted breaches of his fiduciary duties and negligence, caused their injuries before April 1, 2012. See *KPERS v. Reimer & Koger Assocs.*, 262 Kan. 110, 118, 936 P.2d 714 (1997) (holding appellate court will affirm a trial court's judgment, regardless of incorrect reasoning, if the trial court is right for any reason).

Many of those same facts show that the Pages' identical claims were reasonably ascertainable before April 1, 2012. The trial court found that the Pages could have reasonably ascertained that Don might have committed breaches of his fiduciary duties,

42

negligent supervision, negligence, and negligent misrepresentation resulting in injuries no later than February 1, 2012. By February 1, 2012, the following uncontroverted evidence supports that the Pages knew Don was neither managing BDC's finances nor its employees: (1) the Pages knew that BDC had filed for bankruptcy; (2) the Pages had access to Don's testimony from the first meeting of the creditors; (3) the Pages, through their attorney, received both of Larry's emails concerning A.J. embezzling and the accounting reports; (4) the Pages had filed their creditor claim against BDC, recognizing that their property had gone missing under Don's watch; and (5) the Pages had filed a counterclaim against Farm Credit, recognizing problems with BDC finances and employees. Consequently, the Pages should have known that their injuries may have been caused by Don's mismanagement by February 1, 2012. Thus, the fact that Don may have caused their injuries by breaching his fiduciary duties and committing various acts of negligence was reasonably ascertainable by that date.

Next, it is also clear that the Pages and Knisleys' claims regarding Don's fraud were reasonably ascertainable before the April 1, 2012, statute of limitations date. First, however, it is important to note that although the Pages and Knisleys assert that Don committed "fraud" by failing to tell them about BDC's true financial state, including "misdeeds of [BDC] employees," their claims are actually for fraudulent concealment because they accuse Don of failing to tell them a material fact. To successfully prove fraudulent concealment, a plaintiff must establish that the defendant had knowledge of a material fact that the plaintiff could not have discovered through reasonable diligence, when that defendant had a duty to communicate, but failed to communicate the material fact. *Zawaideh v. Nebraska Dept. of Health & Human Servs.*, 280 Neb. 997, 1010, 792 N.W.2d 484 (2011). As discussed earlier, the trial court determined that the Knisleys should have known about any fraud by February 14, 2011, the date A.J. was fired. The uncontroverted facts, however, do not establish that the Knisleys should have suspected Don of committing fraud by February 14, 2011.

43

Nevertheless, the uncontroverted facts do establish that both the Pages and Knisleys should have known about any potential fraud claim against Don before April 1, 2012. As discussed earlier, the Pages and Knisleys had knowledge of BDC's financial and employee troubles that occurred under Don's watch well before April 1, 2012. Even if Don knew of but hid this information, the Pages and Knisleys should have suspected that Don may have hidden this information from them when they first learned about A.J.'s embezzling. Again, the statute of limitations begins to run when the plaintiff can determine if "'[his or her] injury *may be* caused by some act of the defendant,'" that is, the statute of limitation triggers when a plaintiff first realizes there is a possibility that such person is the proper defendant. (Emphasis added.) *Michaelis*, 48 Kan. App. 2d at 631. Here, because A.J. managed to embezzle $1,500,000 to $3,000,000 under Don's watch, the Pages and Knisleys should have considered and investigated the possibility that Don at least had some idea about A.J.'s embezzling while it was happening.

Additionally, although the trial court did not discuss this in its findings, Don's testimony at the October 2011 first meeting of the creditors put the Pages and Knisleys on notice that Don knew about some of A.J.'s misdeeds months before A.J. was fired. At the first meeting of the creditors in October 2011, Don testified that he first had concerns about A.J. "at the end of the year," meaning the end of 2010, because he had learned that A.J. had an unauthorized personal bank account containing BDC money. Despite the Pages and Knisleys' arguments that they could not have known about "Don's complicity" in A.J.'s embezzling before his February 2014 deposition, Don testified in October 2011 that he knew about aspects of A.J.'s embezzling before firing him. If Don had failed to tell the other members about this information, then this testimony would have triggered the statute of limitations to bring a fraudulent concealment action against Don. Indeed, Don's testimony put the Pages and Knisleys on notice that Don had failed to share material information about both BDC's finances and a BDC employee's misdeeds. As a result, the fact that Don might have fraudulently concealed information, resulting in the

44

Pages and Knisleys' injuries, was reasonably ascertainable no later than Don's October 2011 testimony.

Finally, the fact that the Hauns might have converted the Pages' cattle and corn was reasonably ascertainable before the April 1, 2012, statute of limitations date. The trial court ruled that the Pages could have reasonably ascertained that the Hauns converted the Pages' cattle, corn, and cattle and corn sale proceeds by December 2011, when they filed their creditor claim against BDC. Again, in their December 2011 creditor claim, the Pages stated that "[c]attle on Debtor's premises that were lost, sold or moved off premises without owners consent and/or payment, and corn on Debtor's premises involved in fire loss, or utilized by Debtor without consent and payment." This statement shows that the Pages knew that BDC, under the management of the Hauns, had used its property in a way it did not have permission use. In other words, the Pages knew that BDC, through the Hauns' management, had converted their cattle and corn because they had engaged in an "'intentional exercise of dominion or control'" over the cattle and corn, which so seriously interfered with their rights as owners that they were entitled to payment. See *First Nat. Bank of Omaha v. Acceptance Ins. Co.*, 12 Neb. App. 353, 375, 675 N.W.2d 689 (2004). In short, the trial court correctly ruled that the Pages could have reasonably ascertained and did in fact ascertain that the Hauns converted their cattle and corn by December 2011.

*Conclusion*

In summary, the uncontroverted facts prove all of the Pages' injuries and Knisleys' injuries related to cattle and corn losses were reasonably ascertainable before April 1, 2012. Moreover, the uncontroverted facts prove that the fact that the Hauns may have caused those injuries was also reasonably ascertainable before April 1, 2012. As a result, no genuine issue of material fact exists. In turn, the Pages and Knisleys' remaining claims

45

concerning injuries stemming from cattle and corn losses are clearly barred under the 2-year time limit in K.S.A. 60-513(a)(4).

*Did the Trial Court Err When It Denied the Pages and Knisleys' Motion to Amend Their Petition?*

Finally, the Pages and Knisleys argue that the trial court erred when it denied their motion to amend their petition. In essence, the Pages and Knisleys argue that because they sufficiently pled contract claims against the Hauns under Kansas' notice pleading standard, they should have been given leave to amend their petition to more clearly state these claims. The Pages and Knisleys also contend that they should have been allowed to amend their petition because their contract claims were not yet barred by the statute of limitations. On the contrary, the Hauns contend that the trial court correctly denied the Pages and Knisleys' motion because the Pages and Knisleys moved to amend their petition to avoid summary judgment.

*Applicable Law*

Under K.S.A. 2015 Supp. 60-215(a)(2), once the time to amend a pleading as a matter of course has passed, "a party may amend its pleading only with the opposing party's written consent, or the court's leave. The court should freely give leave when justice so requires." When reviewing a trial court's decision to deny a motion to amend petition, an appellate court will uphold the trial court's decision so long as it did not abuse its discretion. *Smith v. Philip Morris Companies*, 50 Kan. App. 2d 535, 586, 335 P.3d 644 (2014), *rev. denied* 302 Kan. 1011 (2015). The trial court's decision "will not constitute reversible error unless it affirmatively appears that the amendment allowed or denied is so material it affects the substantial rights of the adverse party." *Hajda v. University of Kansas Hosp. Auth.*, 51 Kan. App. 2d 761, 774, 356 P.3d 1 (2015).

46

Moreover, Kansas courts have held that denial of a motion to amend petition was proper when plaintiffs moved to amend only after the entry of summary judgment. See *Kinell v. N.W. Dible Co.*, 240 Kan. 439, 444, 731 P.2d 245 (1987); *Moody Investments, Inc. v. Baldwin*, 12 Kan. App. 2d 686, 694, 754 P.2d 810 (1988); *Saathoff v. Data Systems Int'l, Inc.*, No. 89,890, 2004 WL 292103, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 278 Kan. 847 (2004). In *Moody Investments*, for instance, this court upheld the denial of defendant's first motion to amend answer when (1) the defendant's counsel moved to amend only after summary judgment was granted in favor of plaintiffs; and (2) the defendant wanted leave to amend to include information he was aware of before the trial court granted summary judgment. 12 Kan. App. 2d at 693-94. The *Moody Investments* court held that "[g]iven the failure of counsel to raise the issue or move for amendment before entry of summary judgment, the trial court did not abuse its discretion." 12 Kan. App. 2d at 694.

*The Trial Court Did Not Abuse Its Discretion*

Here, outside of asserting that they could still bring their contract claims in a new suit against the Hauns, the Pages and Knisleys have not provided us with any reason why they should be allowed to amend their petition. The Pages and Knisleys have certainly failed to explain how the trial court's denial of their motion adversely affected their substantial rights.

More importantly, as in *Moody Investments*, the Pages and Knisleys moved to amend their petition only after the trial court had granted partial summary judgment with the goal of including claims that were available to them when they initially filed the petition. The fact that the Pages and Knisleys could have raised the contract claims from the start is unavoidable given that their entire argument below and on appeal is that they were not only aware of their contract claims but sufficiently pled their contract claims in their original petition. According to the Pages and Knisleys' motion to amend, "[t]he only

47

changes [to the first amended petition] include the breach of the Operating Agreement, breach of fiduciary duties sounding in contract, arising from the Operating Agreement, and conversion." Moreover, a comparison of their original petition and proposed amended petition shows that the Pages and Knisleys simply reorganized their time-barred tort claims listed under their breach of fiduciary duty, negligence, and fraud counts into contract claims listed under a new count entitled "Breach of the Operating Agreement."

Thus, given our precedent in upholding the trial court's denial of motions to amend following summary judgment, especially when the parties could have made the amendment before summary judgment, the trial court's decision was not an abuse of discretion.

Affirmed.